**UNITED STATES of America,**
**Appellant,**

v.

**Anthony GIORDANO and Benito**
**Guadagni, also known as**
**"Benny", Appellees.**

**No. 63, Docket 82–1116.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1982.

Decided Nov. 1, 1982.

Robert C. Dorf, New York City, for appellee Anthony Giordano.

Michael F. Coiro, Garden City, N.Y., for appellee Benito Guadagni.

Mary McGowan Davis, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N.Y. (Edward R. Korman, U. S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellant.

Before FEINBERG, Chief Judge, and OAKES and WINTER, Circuit Judges.

FEINBERG, Chief Judge:

The government appeals under 18 U.S.C. § 3731 from the dismissal by Judge Mark A. Costantino of the United States District Court for the Eastern District of New York, 535 F.Supp. 257, of the final count of a seven-count indictment against defendants Anthony Giordano and Benito Guadagni. The first six counts charge Giordano with substantive federal offenses growing out of his alleged practice of arson for hire. Count Seven, the only count before us on this appeal, charges that Giordano and Guadagni violated 18 U.S.C. § 371 by conspiring maliciously to damage and destroy by means of an explosive a piano store "used in interstate commerce and in an activity affecting interstate commerce." The alleged objective of the conspiracy is a criminal offense under 18 U.S.C. § 844(i).

The appeal comes to us in an unusual procedural posture. The government moved before trial to obtain a ruling on the admissibility of testimony and on proposed jury instructions with regard to Count Seven. Defendants moved to dismiss this count, and the judge granted the motion. This appeal followed, and in the meantime trial on the other six counts has been delayed apparently because Guadagni is charged only in Count Seven. Defendants are on bail pending appeal. For reasons indicated below, we reverse the judgment of dismissal and remand Count Seven for trial. Because this criminal proceeding has already been delayed for a significant period of time, we order the mandate to issue forthwith.

I

Since Count Seven of the indictment was dismissed, we accept for purposes of this appeal the statement of the underlying facts given to us by the government, which is based on two hearings before the judge and the documents furnished to him. According to the government, the investigation in this case began when an informant told the FBI that defendant Giordano had previously arranged with others to have business premises destroyed by arson. The FBI decided to attempt to identify the arsonists, and for this purpose instructed the informant to get in touch with Giordano. To carry out an undercover operation, the informant needed a plausible story as to why he wanted arson committed. The FBI agents felt that "the best scenario" would be for the informant to seek destruction of the premises of a business that had a high cost inventory, was insured, and would be affected by the recession. The agents chose a piano store as the supposed target of the arson.

In April 1981, the informant contacted Giordano and met with him, secretly recording their conversations. At the first meeting, Giordano was told by the informant that he knew the owner of a piano store in Queens who was suffering business losses and would be interested in having his store "torched" in order to collect on the insurance. The story was false, although the informer did have in mind an actual piano store, whose approximate location he mentioned. Giordano was apparently eager to enter into an arrangement. He boasted of the stores he had destroyed recently and got down to business right away, seeking

such details as what the insurance coverage was and whether the store had a rear entrance, a pull-down gate, an alarm and a sprinkler system. Giordano stated that he and his partner would do a professional job for a fee based on a percentage of the insurance policy, half paid before the arson and half the day after. Giordano described himself as follows:

. I'm a maniac, I just ... felt like burning a store down. The ... guy was in there last week and I had an argument with the guy. So ... him, I burned his store.

Giordano and the informant met again two days later, presumably to give Giordano the information he had requested and the exact address of the store. In order to protect innocent life and property, the informant was instructed to describe a fictitious store rather than the real one mentioned earlier. At this meeting, the informant told Giordano that the insurance policy was over $100,000 but that the store owner was "super paranoid" and needed reassurance that the job would be a "professional" one. Giordano emphasized that his proposed partner was "an experienced arsonist" and "strictly upper echelon". The informant insisted that he would have to meet Giordano's partner. Before the meeting ended, Giordano fixed the fee ($9,000) and the time (the coming Sunday night) for the crime.

The next day, Giordano introduced the informant to his partner "Benny", defendant Guadagni. Defendants assured the informant that they would "completely destroy" the store but again emphasized they needed specific information regarding the layout of the store. In turn, the informant promised to deliver half of the money the next night, along with the keys to the store and a plan of the interior. After Guadagni left, the informant told Giordano that he was satisfied with "Benny" and could deliver half of the fee right away. He proceeded to do so, counting out $4,500 and handing it to Giordano along with a set of keys

and the supposed address of the store. Shortly after this meeting, defendants were arrested.

## II

Defendants were indicted in May 1981, and the case was eventually set for trial in October.[1] Shortly before trial, the government sought rulings on the admissibility of the testimony of two experts and the propriety of certain proposed jury instructions that the government intended to request. The testimony of the experts was designed to show that all pianos have parts made outside New York so that any store selling pianos would be engaged in an activity that affects interstate commerce. The proposed jury instructions included the statement that in determining whether the target of the conspiracy was used in activities affecting interstate commerce, the jury should consider the facts as defendants believed them to be. The proposed instructions also stated that it is not a defense that "commission of the underlying crime, that is the destruction of the piano store, would have been impossible because the store did not exist."

Defendants countered with a motion to dismiss Count Seven of the indictment for lack of jurisdiction on the ground that the government's proposed proof would not establish a crime within the terms of the applicable statute. Relying heavily on our decision in *United States v. Mennuti,* 639 F.2d 107 (2d Cir. 1981), the judge granted the motion on the ground that "absent a specific identifiable parcel of property which was the target of the conspiracy, there is no sufficient link under section 844(i) to bring this crime within the ambit of federal jurisdiction." This appeal by the government followed.

## III

■ In analyzing the issue before us, it is helpful to start with the criminal statute that defendants are charged with having

1. There were also two superceding indictments and some pretrial motions in the intervening period.

violated, 18 U.S.C. § 371. That section makes it a crime for two or more persons to "conspire ... to commit any offense against the United States ...." It is well established that conspiracy is a crime separate and apart from the substantive offense that is the object of the conspiracy. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). The Court there stated a principal reason why this is so, 420 U.S. at 694, 95 S.Ct. at 1268:

> The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon is actually committed. *United States v. Bayer,* 331 U.S. 532, 542 [67 S.Ct. 1394, 1399, 91 L.Ed. 1654] (1947). Criminal intent has crystallized, and the likelihood of actual, fulfilled commission warrants preventive action.

Since the conspiratorial plan itself raises the danger, the illegality of the agreement does not depend upon the achievement of its goal, as the language just quoted indicates. See also *United States v. Shoup,* 608 F.2d 950, 957 n.13 (3d Cir.1979). Moreover, it does not matter that the ends of the conspiracy were from the beginning unattainable. See *United States v. Rabinowich,* 238 U.S. 78, 85–86, 35 S.Ct. 682, 683–684, 59 L.Ed. 1211 (1915); *United States v. Rose,* 590 F.2d 232, 235–36 (7th Cir.1978), cert. denied, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979); *United States v. Waldron,* 590 F.2d 33 (1st Cir.), cert. denied, 441 U.S. 934, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Quijada,* 588 F.2d 1253, 1255 (9th Cir.1978).

Thus, federal jurisdiction does not depend on proof that the objective of the conspiracy has been, or could have been, achieved. Jurisdiction is established by proof that the accused planned to commit a substantive offense which, if attainable, would have violated a federal statute, and that at least one overt act has been committed in furtherance of the conspiracy. The key, as the Court stated in *Feola,* supra, is whether facts exist "tying the proscribed conduct to the area of federal concern delineated by the statute," 420 U.S. at 695, 95 S.Ct. at 1969. If so, then the agreement to commit a crime, although not carried out, is a crime that can be prosecuted in the federal courts. The "federal concern" behind 18 U.S.C. § 844(i), which is reproduced in the margin,[2] is clear. Congress intended to protect business properties engaged in interstate commerce or in activities affecting interstate commerce against the threat of destruction by explosives. And, as we noted in *United States v. Barton,* 647 F.2d 224, 231–32 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), the reach of the statute is broad indeed, applying even to commercial buildings used in activities that have only a de minimis effect on interstate commerce. The government asserts that it will prove that defendants intended to destroy by means of explosives a business establishment used in activities affecting interstate commerce and that defendants expected to be paid $9,000. If the government can prove that, the threat to commerce protected by § 844(i) is clear.[3]

**2.** The statute provides:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment

for any term of years, or to the death penalty or to life imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

**3.** Defendants assert that the government can prove at most only that defendants planned arson without the use of explosives, an objective not banned by § 844(i). The government rejoins that defendants planned to use an explosive device. At this stage of the proceeding, we must take the government's assertion as true.

■ The district judge thought that it would be impossible to establish the necessary link to interstate commerce for a business property that exists only in the "minds of government agents." But a "misapprehension" by the conspirators as to facts that make it impossible for them to commit the crime that is the object of the conspiracy does not make the conspiracy less culpable. Cf. *United States v. Waldron,* supra (fact that appellant was mistaken in his "assumptions and belief . . . that the [painting was] authentic, stolen, and of great value" no defense to charge of conspiracy to "transport . . . in . . . foreign commerce goods worth at least $5,000, knowing the goods to have been stolen").[4] Consider how different the issue here would seem if the fictitious target of the conspiracy had been an as yet unidentified major airport in a large metropolitan area. It is not the fictitious nature of the piano store that makes its link to interstate commerce seem weak or non-existent; it is its character as a piano store. But the government should be given an opportunity to prove, as it says it can, that any piano store in New York State is engaged in an activity affecting commerce.[5] Cf. *United States v. Staszcuk,* 517 F.2d 53 (7th Cir.) (en banc), cert. denied 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

Defendants claim that if we hold the indictment valid on these assumed facts, we will overrule or "substantially alter" our holdings in *United States v. Barton,* supra, *United States v. Mennuti,* supra, and *United States v. Archer,* 486 F.2d 670 (2d Cir. 1973). We do not agree. *Barton,* as already indicated, offers no comfort to defendants and emphasizes the broad reach of Congressional concern to prohibit activities covered by § 844(i). *Mennuti* held that

only commercial enterprises are covered by the statute; there is no claim here that defendants conspired to destroy a residential building, as in *Mennuti.*

■ Finally, *Archer* is clearly distinguishable. It is true that we there refused to uphold jurisdiction of a prosecution under the Travel Act, 18 U.S.C. § 1952, on the ground that a single interstate telephone call, placed by a government agent to a defendant in an obvious attempt to create federal jurisdiction, was insufficient use of interstate facilities to justify application of the Travel Act. We also criticized the tactics used by federal agents in that case, including a fictitious arrest and falsified arrest records, the objective of injecting "the Federal Government into a matter of state concern," 486 F.2d at 672, and the inducement of crime based on "only a generalized belief that something was rotten in the Queens County District Attorney's office." Id. at 675. But this case is a far cry from *Archer.* Here in contrast, no official documents were falsified, the FBI agents had received prior information that Giordano was involved in destroying business premises for hire, and the federal concern was significant because the substantive crime being plotted was explicitly covered by a federal statute, 18 U.S.C. § 844(i). It may sometimes happen that government activity creates so much of a crime that a federal court should on due process grounds void a conviction, as we suggested in *Archer,* 486 F.2d at 676–77. But this is not even close to being that sort of a case; defendants were apparently eager to commit the substantive crime, and the government's use of fictitious premises was based on a legitimate concern for the safety of a bona fide business that the agent originally had

---

**4.** Cf. also *United States v. Rose,* supra (defendants, who unwittingly engaged government agents to steal and transport goods, guilty of conspiracy to transport in interstate commerce goods valued at $5,000 or more and known to be stolen); *Beddow v. United States,* 70 F.2d 674 (8th Cir. 1934) (appellant guilty of conspiracy to defraud United States through forgery of signatures on bonds even though conspiracy could never have been successful because nota-

rization was insufficient documentation for redemption of Treasury Bonds).

**5.** As we pointed out in *United States v. Barton,* 647 F.2d 224, 231 n. 7 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), the burden would be on the government to prove beyond a reasonable doubt the facts that establish the effect on interstate commerce.

in mind. Defendants claim that *Archer* rejects what defendants call the "self-created jurisdiction" in this case. But, for the reasons already given, we do not believe this is so. There is no more "self-created jurisdiction" here than there was in the Abscam convictions already affirmed by this court, *United States v. Myers,* 692 F.2d 823 at 849–50 (2d Cir. 1982); *United States v. Alexandro,* 675 F.2d 34, 39–42 (2d Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982), and by the Third Circuit, *United States v. Jannotti,* 673 F.2d 578, 610–11 (3d Cir.), cert. denied, —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). If anything, this case is stronger for the government because these defendants on this record plainly were already in the business of destroying businesses for a fee.

In short, we believe that the district court erred in dismissing Count Seven. We reverse the judgment of the district court and remand for further proceedings and, we hope, a prompt trial on all the counts of the indictment.[6] The mandate shall issue forthwith.

---

**6.** In view of the statement of the district judge that he would recuse himself if Count Seven went to trial, we assume that the trial will be before another judge.