**UNITED STATES of America, Appellee,**

v.

**Seymour MORGENSTERN, Defendant–Appellant.**

**No. 1183, Docket 90–1662.**

United States Court of Appeals, Second Circuit.

Argued April 16, 1991.

Decided May 22, 1991.

Mark A. Summers, New York City (Hoffman & Pollok, of counsel), for defendant-appellant.

Paul A. Engelmayer, New York City, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Samuel Whitney Seymour, Asst. U.S. Atty., of counsel), for appellee.

Before LUMBARD, FEINBERG and McLAUGHLIN, Circuit Judges.

FEINBERG, Circuit Judge:

Defendant Seymour Morgenstern appeals from a judgment of conviction on two counts entered in the United States District Court for the Southern District of New York, Robert W. Sweet, J., after a jury trial. Morgenstern was found guilty on Count One of executing a scheme to obtain approximately $728,000 of his client's funds from Chemical Bank without authorization and by false and fraudulent pretenses, in violation of 18 U.S.C. § 1344(a)(2); and on Count Two of making, uttering and possessing counterfeit and forged checks in the approximate total amount of $32,590, in violation of 18 U.S.C. § 513. Judge Sweet sentenced Morgenstern to a prison term of 27 months, to be followed by a three-year term of supervised release. On appeal, Morgenstern argues that (1) the district court lacked jurisdiction over the check

fraud scheme alleged in Count One because this offense was not covered by the applicable federal bank fraud statute, 18 U.S.C. § 1344(a)(2); (2) his conviction on Count Two, the forgery count, was invalid because the government did not show that all 13 checks identified in the indictment were forged; and (3) his indictment should have been dismissed because government misconduct led to the destruction of documents material to his defense. For reasons given below, we affirm.

## I. Factual Background

### A. *Morgenstern's Fraud Scheme*

From the evidence before it, the jury could have found the facts as follows: Starting in 1969, Seymour Morgenstern, an accountant, was employed on a part-time basis by Leo Gross and his son, Paul, to handle the tax affairs of three separate business entities engaged in the manufacturing and marketing of sweaters (the sweater companies). Morgenstern had two main responsibilities. First, he prepared annual tax returns for the companies and for the Gross family. Second, he determined the amounts owed by the companies for federal, state and local taxes, and prepared checks to satisfy these obligations.

In the mid–1980s, Morgenstern initiated a scheme to divert money designated to cover the sweater companies' payroll tax liability to an account under his own personal control at Chemical Bank. He did so by exploiting the Grosses' longstanding practice of using Chemical Bank as an intermediary to forward to the Internal Revenue Service (IRS) their federal payroll tax payments, e.g., withholding and social security taxes. Rather than sending payroll tax checks directly to the IRS, the sweater companies made their payroll tax checks payable to "Chemical Bank" and deposited them in an internal account at the bank known as a "payroll tax depository." The bank then forwarded the tax depository's contents to the IRS, indicating the portions attributable to the accountholders who had made deposits in it that day. Morgenstern drafted and presented to the Grosses payroll tax checks, payable to "Chemical Bank," and, after either Leo or Paul Gross had signed them, took them to the bank for deposit in the tax depository.

In early 1985, Morgenstern began to misrepresent to the Grosses the amount of payroll taxes the sweater companies owed. He presented them with checks made out to "Chemical Bank," which he told them were necessary for payment of payroll taxes although the total sum of such checks vastly exceeded the companies' actual payroll tax obligations. Relying on Morgenstern's assurance that payroll taxes were due in the amounts on the checks, the Grosses signed the checks and gave them to Morgenstern, assuming that he would deposit them in the tax depository at Chemical Bank.

Rather than doing that, however, between January 1985 and May 1989, Morgenstern deposited a large number of sweater company checks payable to "Chemical Bank" in a corporate account he controlled at the bank under the name "Amerco International". Morgenstern eventually withdrew nearly all the funds from that account, spending them on a wide array of personal expenses.

In carrying out his scheme, Morgenstern made almost all of his unauthorized deposits in the Amerco account at the same Chemical branch, located near his home one block from Lincoln Center in Manhattan. During this period he also used the same branch to carry out hundreds of legitimate transactions involving checks drawn on the sweater companies' accounts and signed by Leo or Paul Gross. These included the large majority of payroll tax checks that Morgenstern properly deposited in the tax depository as well as the fee checks he received from the Grosses for his accounting services, which he generally deposited in the Amerco account.

In early 1988, responsibility for drafting and depositing the sweater companies' payroll tax checks was shifted from Morgenstern and given to a firm hired to print employee paychecks. This change compelled Morgenstern to modify his scheme. He began to alter checks made out to various tax authorities, e.g., New York State or

the IRS, which the Grosses had signed and given to him for mailing. Using a pen eraser, Morgenstern erased the name of the original payee on the checks and then rewrote the payee as "Chemical Bank." He also altered the dollar amounts on the face of many of these checks, generally increasing the amounts to between $1500 and $6000. Morgenstern then presented these checks—now made out to Chemical Bank and signed by the Grosses—to his neighborhood branch for deposit in the Amerco account.

In sum, Morgenstern deposited into the Amerco account a number of sweater company checks on which he had altered the payee to read "Chemical Bank." Counting the payroll tax checks Morgenstern had previously diverted, a total of approximately 225 checks made out to "Chemical Bank" were deposited in the Amerco account by Morgenstern. These checks totaled roughly $728,000.

## B. *Government Mishandling of Documents*

In May 1989, a bank teller at the Lincoln Center branch of Chemical Bank noticed erasures in the payee and dollar amount areas of a check that Morgenstern had tried to deposit in the Amerco account, and immediately notified her superiors at the bank. A subsequent investigation by Chemical Bank revealed the full extent of Morgenstern's fraudulent deposits of checks payable to the bank, and the Grosses reported the results of this investigation to the United States Attorney and the FBI. Shortly thereafter, special agents of the FBI searched Morgenstern's apartment in Manhattan pursuant to a search warrant and seized seven boxes of financial records relating to the Grosses and to Morgenstern. Included among these documents were tax and financial records of the sweater companies and the Gross family dating back 20 years, which Morgenstern had retained in his apartment to prepare their tax returns.

In July 1989, Special Agent Gregory Pack, who was in charge of supervising the documents seized from Morgenstern, was contacted by Paul Gross, who requested access to the documents to enable his new accountant to prepare individual and corporate tax returns that were coming due. The FBI initially permitted Gross to review the papers in two of the seven boxes, and Agent Pack agreed to photocopy the sets of papers that Gross claimed his accountant needed. Agent Pack did not, however, photocopy all the documents required by Gross, and in late September 1989, after consulting with the Assistant United States Attorney then handling the case, he loaned Gross two boxes containing the original seized documents formerly in Morgenstern's possession that related to the Grosses. No item-by-item inventory of the documents in the two boxes was made at the time of Paul Gross' removal of the original documents, nor did the FBI make copies of the removed documents.

In the interim, in September 1989, the grand jury returned an indictment against Morgenstern. In November 1989, Morgenstern and his attorney visited the FBI's office to review the seized documents, and, after noticing that papers relating to his work for the Grosses were missing, Morgenstern was informed that two boxes of documents had been loaned to the Grosses. Agent Pack then contacted Paul Gross requesting return of the documents, and shortly thereafter most (though not all) of the documents contained in the two boxes loaned to the Grosses were returned to the FBI.

Morgenstern's counsel then had the opportunity to inspect the recovered documents at the FBI and prepare his own detailed inventory. After reviewing this inventory, Morgenstern filed an affidavit stating that although he could not say "for certain that any particular document is missing from among those [he] had in [his] apartment," based upon his review of his counsel's inventory "certain" unspecified documents which at one time were among the inventoried records appeared to be missing. On this basis, Morgenstern moved to dismiss the indictment for the government's misconduct in delivering the documents to the Grosses. In a later affidavit following a review of the contents of

the boxes at the FBI, Morgenstern did list specific documents he claimed were missing. Most of these documents related to questionable business transactions in which the Grosses had supposedly engaged.

The district court held an evidentiary hearing on Morgenstern's motion to dismiss, and denied the motion in an opinion dated May 30, 1990. Applying the balancing test set forth in *United States v. Grammatikos*, 633 F.2d 1013 (2d Cir.1980), the district court denied Morgenstern's motion because: (1) the mishandling of discovery materials was not due to deliberate governmental misconduct, but to gross governmental negligence; (2) Morgenstern failed to meet his burden of proof in establishing that the government's negligent conduct led to the destruction of evidence; and, (3) assuming that evidence was destroyed, it did not cause substantial prejudice to Morgenstern's defense.

The case thereafter proceeded to trial in June 1990. After a seven-day trial, the jury found Morgenstern guilty on both counts. Judge Sweet imposed sentence in November 1990, and this appeal followed.

## II. Discussion

### A. *The Bank Fraud Count*

■ Morgenstern challenges his conviction on Count One on the ground that the district court lacked jurisdiction over his check fraud scheme because it was not covered under the applicable federal bank fraud statute. Morgenstern was charged and convicted under 18 U.S.C. § 1344(a)(2). That subsection read:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> . . . . .
>
> (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

The gist of Morgenstern's jurisdictional claim is that his fraud was committed not against the Chemical Bank, but against the Grosses, and that the evidence was therefore insufficient to implicate him in a scheme to defraud the bank.

Morgenstern relies on *United States v. Blackmon*, 839 F.2d 900, 906 (2d Cir.1988), which interpreted the scope of subsection 1344(a)(2) as follows:

> Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2).

Morgenstern maintains that the fraudulent activity established at trial was neither intended nor designed to deceive the bank. He did not draft checks payable to "Chemical Bank" in order to mislead the bank, but to induce the Grosses to make payments for large amounts, believing that they were thereby complying with their payroll tax obligations; in this way, substantial sums of money could be diverted from the Grosses' account to Morgenstern's own corporate Amerco account with little risk of detection. Moreover, even if the bank was deceived regarding his authority to deposit checks in the Amerco account payable to "Chemical Bank" that were signed by the Grosses, the bank was not an intended victim of his fraudulent scheme. Morgenstern insists that he did not contemplate inflicting actual harm or injury on the bank, which is a necessary element of fraudulent intent under the statute. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987).

Morgenstern argues that in this respect the present case is indistinguishable from *Blackmon*. In *Blackmon*, the fraud victim personally withdrew funds from the bank for delivery to the fraud perpetrators, and this court held that the bank fraud statute is not intended "to cover situations where money is merely withdrawn legally from a federally insured bank by a victim and where the bank itself is in no way victimized." 839 F.2d at 904. In the present case, the fraud was effected not by inducing the victim to go to the bank and withdraw the funds himself, but by obtain-

ing a check from the victim under false pretenses and then depositing it in a bank. Morgenstern claims both cases essentially involved the same type of transaction, namely, the fraudulent transfer of money that happened to rest in banks from one party to another. He argues that since this type of conduct is already criminal under state law and does not victimize a federally insured bank, federal jurisdiction should not be expanded under the bank fraud statute to include it. See *id.* at 906.

Finally, Morgenstern argues that he neither made fraudulent misrepresentations to the bank nor violated its property rights, both of which are necessary elements of defrauding the bank. His mere tender of checks made payable to "Chemical Bank" cannot be construed as a fraudulent misstatement, since under *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982), "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'." He also argues that the diversion of funds from the Grosses' account did not affect the property rights of the bank itself, but served only to diminish the property rights of the Grosses.

The government replies that Morgenstern's fraudulent scheme involved two distinct types of deceptive conduct, the first directed at the Grosses and the second directed at Chemical Bank. The first deceptive conduct induced the Grosses to write checks payable to "Chemical Bank" for non-existent tax liabilities. The second deceptive conduct, directed at Chemical Bank, was designed to induce the bank to believe that Morgenstern had the necessary authority to deposit these checks into the Amerco account as part of his legitimate work for the sweater companies. It was only by successfully deceiving the bank into believing that he had the proper authority to deposit these checks into an account controlled by him—checks neither signed by nor payable to him—that Morgenstern was able to obtain control over $728,000 of the Grosses' funds. In this sense, Morgenstern's fraudulent misrepresentation to the bank of his authority to

deposit these checks was an indispensable part of his overall scheme, and justifies application of the federal bank fraud statute to his conduct.

We believe the government has the better of this argument. While Morgenstern's conduct could have been handled in state court as a simple case of business fraud, this does not preclude treating it as an instance of federal bank fraud if the relevant statutory elements are satisfied. There was substantial evidence that Morgenstern deliberately engaged in a pattern of deceptive conduct designed to convince the bank that he was acting as a duly authorized agent of the Grosses in depositing checks payable to Chemical Bank into a corporate account over which he had control. He returned repeatedly to the same branch to make his unauthorized deposits, and while making them he regularly engaged in numerous legitimate transactions involving checks drawn on the sweater company accounts, including deposit of his own fee checks. By mixing negotiation of legitimate checks with unauthorized deposits of fraudulently procured checks, Morgenstern sought to convey the misleading impression that he was acting within the scope of his legitimate authority and that there was nothing extraordinary about these transactions.

This deceptive course of conduct toward Chemical Bank extended well beyond the silent presentation of individual checks and deposit tickets. It amounted to a false representation that he was properly authorized to deposit the Grosses' checks payable to Chemical Bank into the Amerco account. Morgenstern's reliance on *Williams v. United States* is thus inapposite. See *United States v. Bonnett*, 877 F.2d 1450, 1457 (10th Cir.1989). Furthermore, at trial Judge Sweet explicitly instructed the jury that in order to convict Morgenstern of bank fraud, his fraudulent scheme must be shown to have been carried out by means of fraudulent pretenses directed at the bank with the intention of deceiving it. Morgenstern's conviction indicates that the jury so found, and the evidence amply supports that conclusion.

In this respect, the present case is distinguishable from *Blackmon.* Crucial to the court's decision in *Blackmon* was the determination that the federal bank fraud statute is inapplicable "where money is merely withdrawn legally from a federally insured bank by a victim and where the bank itself is in no way victimized." 839 F.2d at 904. In this case, the money obtained by fraud was not lawfully withdrawn from the bank by the scheme's victim, who only subsequently transferred it to the wrongdoers. Rather, Morgenstern was able to obtain the money only by means of fraudulent conduct directed at the bank itself; this conduct induced the bank to allow the deposit of funds (into the Amerco account) and their subsequent withdrawal that, in the absence of fraud, it never would have permitted.

Because in this case the fraudulent conduct directed at the bank resulted in the improper release to a third party of a depositor's money without its authorization, the bank is properly viewed as an intended victim of the fraudulent scheme. By falling prey to this scheme the bank lost custody over its accountholder's money, exposing the bank to the real threat of civil liability for having succumbed to Morgenstern's fraudulent conduct.[1] Indeed, in *Blackmon* itself the court acknowledged that "if property *were* obtained at such time as it was under the custody or control of a bank, the bank would certainly be a victim." 839 F.2d at 905–06 n. 5.

It is clear that by unlawfully diverting money from the Grosses' account into his own, Morgenstern obtained money "under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses," 18 U.S.C. § 1344(a)(2). His conduct is thus directly covered under the federal bank fraud statute. Morgenstern's claim that the district court lacked jurisdiction because his fraud did not directly affect a property interest of the bank is without merit, because the plain language of the statute makes clear that the statute applies to fraudulent removals not merely of the bank's own property, but also of money under the bank's "custody or control."

 Morgenstern, however, insists that the statutory phrase, "property under [a bank's] custody or control," should be restricted to property over which a bank has physical control, e.g., the contents of a safe deposit box, and not extended to cover funds maintained in bank accounts for customers. We see little to commend this proposition. One of Congress' expressed purposes in enacting the bank fraud statute in 1984 was to extend coverage to offenses involving the taking of property from banks by false pretenses "in which there is not a taking and carrying away of the property." S.Rep. No. 98–225, 98th Cong., 1st Sess. 378 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3518. Accordingly, we reject Morgenstern's jurisdictional challenge to his federal bank fraud conviction.

### B. *The Forgery Count*

 Morgenstern also challenges his conviction on Count Two, the forgery count. He principally argues that the district court erred by instructing the jury that it was not necessary for the government to present proof of forgery of all 13 checks charged in this count, as long as it established a "substantial similarity" between the indictment and the proof. According to Morgenstern, this charge constructively amended the indictment, because it enabled the jury to convict on the basis of proof appropriate for a different offense, i.e., forgery of a lesser number of checks. This issue arose because the district court ruled at trial that only checks whose alteration could be directly proved by handwriting analysis would suffice to prove the forgery count, and the government was able to prove the direct alteration of only 10 checks.

We note that Morgenstern is able to make this argument only because the

---

**1.** Chemical Bank has been sued by the Grosses for allowing Morgenstern to deposit their tax

payments in his own account.

government decided to obtain an indictment combining all of the instances of check forgery in one count rather than charging each one in a separate count. If it had followed the latter course, the three counts representing the three checks for which direct alteration had not been shown would simply not have been submitted to the jury.

In any event, a constructive amendment "occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988). It is well settled that the constructive amendment of an indictment is per se prejudicial, as it directly violates the grand jury clause of the Fifth Amendment. *United States v. Weiss*, 752 F.2d 777, 787 (2d Cir.), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). Such an amendment typically occurs when the proof at trial *"broaden* [s] the possible basis for conviction beyond what was contained in the indictment," *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir.1988) (citing *United States v. Miller*, 471 U.S. 130, 145, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985)), resulting in a defendant being "convicted on a charge the grand jury never made against him," *Stirone v. United States*, 361 U.S. 212, 219, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960). However, where charges are "constructively narrowed" or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, no constructive amendment occurs. *United States v. Miller*, 471 U.S. at 136–40, 105 S.Ct. at 1815–17; *United States v. Zingaro*, 858 F.2d at 99.

In the present case, the evidence supporting Morgenstern's conviction on the check forgery count was wholly encompassed by the charge in the original indictment. The 10 checks on which the jury's verdict rested were all included in the 13 on which Count Two was based. As a consequence, the proof admitted at trial did not broaden the possible basis of Morgenstern's conviction

nor render it substantially likely that he may have been convicted of a charge that the grand jury never made against him. For this reason, we find that no constructive amendment occurred and that the district court properly treated this issue simply as one of variance of proof. Cf. *United States v. Weiss*, 752 F.2d at 790.

■ In viewing this matter as a problem of variance, the district court correctly instructed the jury that there had to be a "substantial similarity" between the indictment and the proof in order to find the defendant guilty. See *United States v. Heimann*, 705 F.2d 662, 666–67 (2d Cir. 1983); *United States v. Morris*, 700 F.2d 427, 429 (1st Cir.), cert. denied, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); L. Sand, *Modern Federal Jury Instructions*, Instructions 3–12, 3–13. Moreover, it is apparent that Morgenstern cannot show that this minor variance caused any prejudice to his defense, as is necessary to prevail on a claim of variance. *Zingaro*, 858 F.2d at 98. If anything, the situation provided Morgenstern an advantage at trial, since it afforded his counsel the opportunity to argue that the government had failed fully to prove what the grand jury alleged in the indictment. In this connection, the district court instructed the jury that if it found the difference between the number of checks charged and proven to be material, it was required to acquit the defendant.

## C. Sanctions For Mishandling Evidence

Finally, Morgenstern argues that the district court erred in denying his pretrial motion to dismiss his indictment for governmental misconduct in mishandling discovery materials. In particular, Morgenstern claims that in view of the district court's finding of gross governmental negligence in mishandling documents it was an error of law for the court to impose upon him the burden of proving that documents were destroyed. Rather, he argues, in such circumstances it is more appropriate to presume the destruction of documents to the prejudice of the defendant and to impose sanctions unless the government can

rebut this presumption. Morgenstern alternatively argues that the district court erred in finding that he did not meet his burden of proof and in denying his claim of substantial prejudice on the assumption that the alleged destruction occurred.

█ We believe Morgenstern's arguments are without merit. While the district court was absolutely clear that the government's loan of selected search warrant materials to the complaining witnesses involved "unthinking negligence of gross magnitude," it also correctly understood that such negligence does not automatically trigger application of the extreme sanction of dismissal of the indictment. To determine whether government misconduct warranted dismissal, the district court properly followed the balancing test set out in *United States v. Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir.1980), which calls for consideration of a number of different factors, including government culpability, a realistic appraisal of the significance of the misplaced material, its bearing on critical issues in the case and the strength of the government's untainted proof.

In analyzing these different factors after a two-day evidentiary hearing, the district court found both that Morgenstern had not proven by a preponderance of the evidence that the Grosses destroyed documents loaned to them and that, even if documents were destroyed, their absence did not substantially prejudice Morgenstern's defense. We see no reason to disagree with either of these rulings. Indeed, Judge Sweet's treatment of the relevant issues in his unpublished opinion was both thorough and persuasive.

The finding that Morgenstern did not meet his burden of proof is certainly not clearly erroneous. The finding of a lack of substantial prejudice is supported by the government's overwhelming proof at trial and the fact that the allegedly missing materials would not, to any significant extent, have served affirmatively to establish Morgenstern's innocence. The only documents that might initially be thought to serve that purpose were those relating to

his time sheets and work reports. Morgenstern claims that these materials could have supported his argument that the money he took was actually additional compensation for otherwise underpaid services rendered over a 20–year period. On closer examination, however, such a suggestion borders on the frivolous, since it requires the assumption that legitimate compensation of a part-time accountant was effected through the surreptitious diversion of funds from a client's bank account.

█ Finally, as to Morgenstern's suggestion that the burden of proof regarding destruction of documents should be shifted in light of governmental negligence in preserving evidence, we do not find this approach supported by the relevant case law. Morgenstern relies on this Circuit's warning over a decade ago that if evidence is deliberately destroyed, "sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) (footnote omitted). However, Morgenstern ignores the fact that here the district court found no "deliberate misconduct." Judge Sweet correctly emphasized in his opinion that in the absence of deliberate, bad faith conduct on the part of the government, a presumption of unlawful acts regarding destruction of evidence is unwarranted. We see no reason to depart from this principle.

We have considered all of appellant's arguments and find them without merit.

The judgment of the district court is affirmed.