UNITED STATES of America, Appellee,

v.

Jerome WALLACE, Defendant–Appellant.

No. 1578, Docket 95-1703.

United States Court of Appeals,
Second Circuit.

Argued June 3, 1996.

Decided June 19, 1996.

Celeste L. Koeleveld, Assistant U.S. Attorney, New York City (Mary Jo White, U.S. Attorney for the Southern District of New York, and Nancy Northup, Assistant U.S. Attorney, on the brief), for Appellee.

Lawrence K. Feitell, New York City, for Defendant–Appellant.

Before FEINBERG, JACOBS and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

Jerome Wallace raises three challenges to his conviction for conspiracy to commit bank fraud in violation of 18 U.S.C. § 371: (i) the FBI "manufactured" federal jurisdiction, in the sense that the only link between Wallace's crime and a federally-insured bank was supplied by the FBI; (ii) the evidence was insufficient to establish that Wallace conspired to defraud this particular bank; and (iii) Wallace could not have committed conspiracy to defraud this particular bank because the bank was never at risk of losing anything. We reject all three claims and therefore affirm.

## I

In a Bronx apartment four years ago, Wallace showed Carl Corso several hundred stolen checks, most of which had been issued by the State of New Jersey Teachers' pension fund. Wallace asked Corso to help him cash ten of the checks by setting up a bank account with the use of false information, double endorsing the checks, depositing them, withdrawing the money after the checks cleared, and abandoning the account. Corso tried to do this, but the bank would not accept his fake I.D. He then asked two friends to deposit two checks apiece in their bank accounts. They did, and the scheme worked.

To cash the other six checks (in the amount of about $70,000), Corso enlisted Vinny Capri who, unfortunately for the schemers, was an FBI informant. After Vinny (falsely) told Corso and Wallace that he had deposited the checks, they demanded a deposit slip. The FBI provided Vinny with a phony deposit slip from a Citibank branch in downtown Manhattan (prepared with the cooperation of Citibank personnel), and Vinny gave it to Corso and Wallace. Wallace then instructed his "secretary" to call Citibank to confirm that the deposit had actually been made. After being put on hold several times by Citibank, the secretary aborted the call for fear that it was being traced.

After the time passed for the check to clear, Wallace demanded that Vinny withdraw the money. Vinny stalled. Wallace and his "associates" then stole Vinny's truck and threatened him in a number of phone calls taped by the FBI. The critical call came on August 24, 1992. In between threats to Vinny and his family, Wallace specifically pressed Vinny to withdraw the money from Citibank:

*Transcript at 5*

No, Vinnie, go back in the bank and get my money now.

*Transcript at 7*

[G]o back in the bank and get something now, Vinnie.

*Transcript at 16*

I would advise you and I'm telling you this now, to sit in front of that bank and make sure there's no more excuses. Do you understand that?

. . .

Hey, look, you don't play games with my money. Three weeks to cash a check? What are you, you out your mind? Three fucking weeks to cash a check, you think I wanta see you anymore? It takes five days, you played with my money three weeks. You could've pulled out a thousand dollars at a time, I would of had all my money by now.

During this conversation, Vinny told Wallace he would deliver the money at a cafe on the Upper East Side. Wallace sent Corso and another associate to pick up the payment. After the pick-up, Wallace and his coconspirators were arrested.

Wallace, his brother Bruce, and Dwayne Register were indicted for bank fraud, extortionate collection of credit, and conspiracy to commit both crimes. Register pleaded out. A jury acquitted Bruce Wallace on all charges. Jerome Wallace was convicted on the substantive extortion charge and both conspiracy charges, and was acquitted on the substantive bank fraud charge. The district court granted Wallace's motion for judgment notwithstanding the verdict on the two extortion charges, finding the evidence insufficient to prove that the extortion was used to collect an "extension of credit," as that term is defined by statute. On the conspiracy to commit bank fraud charge, the court held that the government's evidence and the jury

instructions constructively amended the indictment. It therefore dismissed this charge without prejudice to any future indictment that might be returned on the same issue.

The government appealed. We affirmed the district court's ruling on the extortion charges, but reversed on the conspiracy to commit bank fraud charge, holding that the indictment had not been constructively amended or varied. *United States v. Wallace*, 59 F.3d 333, 338, 340 (2d Cir.1995). The jury's guilty verdict on the bank fraud conspiracy charge was thus reinstated, and the case returned to the district court. After sentencing, Wallace took this appeal, challenging the merits ·of his conviction on the three grounds listed above.[1]

## II

### A. "Manufactured" federal jurisdiction

Wallace's offense constitutes conspiracy to violate the federal bank fraud statute only because the offense involved Citibank, which is a federally insured bank. *See* 18 U.S.C. §§ 20, 1344. Citibank became involved only because the FBI gave Vinny phony Citibank deposit slips, so that he could satisfy Wallace's demand for proof that the deposit had been made. Wallace contends that this constitutes "manufactured" federal jurisdiction and that, under *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), the indictment must therefore be dismissed.

In *Archer*, federal agents set up an elaborate sting operation to nab corrupt judges and prosecutors in Queens County. The agents arranged for undercover informants to commit several "crimes" and then kept watch as the prosecution process unfolded. During the course of the operation, the informants lied to local law enforcement officials, prosecutors, grand juries, and judges. To ensure that the corrupt acts committed by the targets of the investigation would constitute violations of the Travel Act, 18 U.S.C. § 1952, the informants placed interstate calls to the targets to discuss the scheme, and prompted the targets to make interstate calls by giving them out-of-state numbers at which the informants could supposedly be reached. Ultimately, a district attorney and local defense lawyer, among others, were indicted for violating the Travel Act. *Id.* at 672–74.

This Court held that the interstate phone calls were insufficient to satisfy the "use of a facility in interstate commerce" element under the Travel Act, because "the federal officers themselves supplied the interstate element" and had "[m]anufactured federal jurisdiction." *Id.* at 682. On petition for rehearing, the court clarified its opinion, explaining that "there is no indication that the defendants agreed either to make or to cause to be made any interstate or foreign telephone calls." *Id.* at 684–85.

Courts that have construed *Archer* have taken pains to limit its applicability, *see United States v. Keats*, 937 F.2d 58, 64–65 (2d Cir.) (interstate calls by federal agents can satisfy jurisdictional element as long as it was "reasonably foreseeable" to defendants that the calls would take place), *cert. denied*, 502 U.S. 950, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991), and to explain that "manufactured jurisdiction" as an independent doctrine is a dubious concept. *See, e.g., United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir.1994); *United States v. Podolsky*, 798 F.2d 177, 180–81 (7th Cir.1986) (Posner, J.). These cases make clear that the "manufactured jurisdiction" concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense, *see Podolsky*, 798 F.2d at 181; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous, *see LaPorta*, 46 F.3d at 160; or (iii) an element of the federal statute has not been proved, so federal courts have

---

1. On the original appeal, Wallace challenged only the district court's ruling that the government could seek another indictment on the bank fraud conspiracy charge. His claim that this violated the Double Jeopardy Clause was mooted by the Court's reinstatement of the jury's guilty verdict on the bank fraud conspiracy charge. This is therefore Wallace's first opportunity to appeal the merits of his conviction.

no jurisdiction over the crime, *see United States v. Clark*, 62 F.3d 110, 112 (5th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 734, 133 L.Ed.2d 684 (1996); *Podolsky*, 798 F.2d at 181. The first theory does not apply, since Wallace did not make an entrapment defense, and could not have made such a defense in any case since he was obviously predisposed to defraud banks. The second category is inapplicable as well: unlike the government's conduct in *Archer*, which arguably could have supported a due process claim of outrageousness, the FBI committed no crimes here, acted with Citibank's cooperation, and lied to no one (except the conspirators).

Thus, Wallace's manufactured jurisdiction claim is assertable, if at all, only in aid of the third (jurisdictional) theory of defense, the one closest to the Archer scenario and holding. Courts have refused to follow *Archer* when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the FBI introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met, despite the surface similarity to *Archer*. *See LaPorta*, 46 F.3d at 154, 160 (FBI informant asked defendant, suspected of being an arsonist, if he would set fire to the informant's "daughter's car," which was actually a government-owned car; conviction for destroying government property by fire upheld and claim of "manufactured jurisdiction" rejected, because "the defendants themselves committed the substantial jurisdictional act of burning the government [car]" (internal quotation marks omitted)); *United States v. Lau Tung Lam*, 714 F.2d 209, 210–11 (2d Cir.) (DEA informant in Europe, asked by defendant whether she knew of any heroin buyers, steered defendant to drug buyers in America; conviction for conspiracy to import heroin upheld and claim of "manufactured jurisdiction" rejected, because the defendant "himself committed the sub-

stantial jurisdictional act of bringing drugs into the United States"), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 322 (1983); *United States v. Gambino*, 566 F.2d 414, 418–19 (2d Cir.1977) (after government created phony garbage-collection business in the Bronx with ties to interstate commerce, defendants tried to intimidate the business into closing shop; Hobbs Act conviction upheld and claim of "contrived jurisdiction" rejected because "the activities of [the phony business] were necessarily wedded to interstate commerce" and because "[n]o one asked [the defendant] to threaten the FBI agent [posing as the business owner] or to hit him on the head"), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

Cases from other circuits make the same point. *See Clark*, 62 F.3d at 111, 114 (5th Cir.) (informant asked car thief to drive car across state lines for the sole purpose of establishing federal jurisdictional element; conviction for interstate transportation of stolen motor vehicle upheld and "manufactured jurisdiction" claim rejected because "the government had a legitimate interest in identifying and apprehending car thieves who are willing to steal cars in one state and transport them to another for disposition"); *United States v. Peters*, 952 F.2d 960, 963 (7th Cir.) (same facts and same result; "manufactured jurisdiction" claim rejected because the informant "merely furnished the defendant with an opportunity to complete his scheme"; "[t]he fact that the agents steered [the defendant] to commit a crime within federal jurisdiction rather than hand him over to [the local] police does not render federal jurisdiction inappropriate" (internal quotation marks omitted)), *cert. denied*, 503 U.S. 911, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992); *Podolsky*, 798 F.2d at 180 (7th Cir.) (informant asked arsonist to burn down a building over which there was federal jurisdiction for sole purpose of establishing jurisdiction; "[t]he Bureau of Alcohol, Tobacco and Firearms did not put 2438 West Division Street into interstate commerce; it was there all the time; they just induced [the defendant] to direct his criminal intentions there").[2]

---

2. Our research has uncovered only two appellate    court cases (both in the Fourth Circuit) in which

■ With a proper understanding of *Archer*'s limited precedential force, it is clear that Wallace's "manufactured jurisdiction" argument fails, because all elements of the statute, as construed by the indictment, have been met.[3] The indictment charged Wallace with conspiring "to execute a scheme and artifice to defraud a financial institution, to wit, Citibank ... in that the defendants would and did ... wrongfully receive payment on the [stolen] checks...." Although Citibank was introduced to the scheme only because of the FBI's actions, Wallace did indeed "execute a scheme ... to defraud ... Citibank." After Vinny told Corso and Wallace that the checks had been deposited, they demanded proof. The Citibank deposit slips were then produced. The testimony indicates that Wallace scrutinized the slips for authenticity and was well aware that the apparent location of the funds was Citibank. He even ordered his "secretary" to call Citibank in an attempt to confirm the deposit. Finally, in the phone conversation on August 24, 1992, Wallace twice demanded that Vinny "go back in the bank and get my money now" and ordered him "to sit in front of that bank and make sure there's no more excuses." This evidence shows Wallace purposefully trying to defraud Citibank. Unlike the conspirators in *Archer*, who never agreed to make any interstate phone calls, Wallace and his coconspirators clearly undertook to pressure Vinny to withdraw money from Citibank. The jurisdictional element was therefore an essential part of the conspiratorial agreement. Since all of the statutory elements have been met, *Archer*, as limited by subsequent holdings, does not control, and

Wallace's "manufactured jurisdiction" claim must be rejected.

## B. Insufficient evidence

As defined by the indictment, the purpose of the conspiracy was to "execute a scheme and artifice to defraud ... Citibank [by] wrongfully receiv[ing] payment on the [stolen] checks." The indictment listed ten overt acts that the defendants committed in furtherance of the conspiracy; by the time Wallace's case reached trial, the list of ten was narrowed to three:

1. Two of Wallace's coconspirators stole Vinny's truck;

2. Wallace and others made a threatening phone call to Vinny on August 24, 1992; and

3. On the same day, two of Wallace's coconspirators met Vinny and received a partial payment from him on the stolen checks.

Wallace argues that even if these acts were proved, they do not prove that he "committed any overt acts to ensure the[ ] collection [from] Citibank." He thus claims that the government never proved the conspiracy as defined in the indictment.

■ During Wallace's threatening phone call—the second overt act—he explicitly asked Vinny to withdraw the funds from "the bank," which Wallace knew to be Citibank. The jury could easily have found that this phone call constituted an act in furtherance of an agreement to defraud Citibank by attempting to withdraw the money allegedly deposited there. Wallace's argument therefore fails.

*Archer* was followed and convictions were overturned because of "manufactured" jurisdiction. In *United States v. Coates*, 949 F.2d 104, 105 (4th Cir.1991), jurisdiction was founded solely on one interstate phone call placed by a federal agent; so there was no affirmative link between the federal element and the defendant's actions. In *United States v. Brantley*, 777 F.2d 159 (4th Cir. 1985), *cert. denied*, 479 U.S. 822, 107 S.Ct. 89, 90, 93 L.Ed.2d 42 (1986), agents set up a sham gambling den with equipment and liquor brought from other states. The court overturned the Hobbs Act conviction of a local sheriff who had shielded the gambling operation, because "the [interstate] commercial predicate for federal jurisdiction" was achieved merely by "pretense," *id.* at 163, and was not "reasonably necessary or

appropriate" in the circumstances. *Id.* at 162. The validity of the reasoning in *Brantley* has been questioned by one court. *See Podolsky*, 798 F.2d at 180. In addition, the *Brantley* court allowed the sheriff's conspiracy conviction to stand, since "[i]f the true facts had been as they believed them to have been, commerce would clearly have been affected." *Id.* at 163, 164. Since our case involves only a conspiracy conviction, the section of the *Brantley* opinion overturning the sheriff's substantive conviction has limited reference.

3. Wallace does not claim that the conduct charged in the indictment falls outside the statute.

Because this argument fails, Wallace's further argument (made in passing) that the jury charge was improper because it listed overt acts with no connection to a scheme to defraud Citibank, loses any force it may have had.

### C. Impossibility of completing the conspiracy

Wallace points out that Citibank was never at risk of losing anything, and that it was therefore impossible to complete the conspiracy. He says that since the bank could not have been defrauded, there could be no conspiracy to commit bank fraud. This argument is meritless.

■■■■ To be complete, a conspiracy simply requires (i) an agreement about the object of the conspiracy, (ii) specific intent to achieve that object, and (iii) an overt act in furtherance of the agreement. *United States v. Montour,* 944 F.2d 1019, 1024 (2d Cir. 1991). That the conspiracy cannot actually be realized because of facts unknown to the conspirators is irrelevant. *United States v. Giordano,* 693 F.2d 245, 249 (2d Cir.1982) ("[I]t does not matter that the ends of the conspiracy were from the beginning unattainable."). In *Giordano,* an FBI informant asked a suspected arsonist to burn down a fictitious piano store, invented by the FBI for the purposes of the sting. This Court explained why the defendant's conspiracy conviction was appropriate despite the impossibility of completing the substantive offense:

> The district judge thought that it would be impossible to establish the necessary link to interstate commerce for a business property that exists only in the "minds of government agents." But a "misapprehension" by the conspirators as to facts that make it impossible for them to commit the crime that is the object of the conspiracy does not make the conspiracy less culpable.

*Id.* at 250; *see also id.* at 249 ("[F]ederal jurisdiction does not depend on proof that the objective of the conspiracy has been, or could have been, achieved."); *United States v. Shively,* 715 F.2d 260, 267 (7th Cir.1983) (bank fraud conspiracy conviction upheld even though bank was not federally insured,

because defendants *thought* it was federally insured), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). Since a sham business may be the victim of a conspiracy, *a fortiori* an existing business that was never in harm can be the victim of a conspiracy as well.

Wallace's attempt to rely on *United States v. Blackmon,* 839 F.2d 900 (2d Cir.1988), and *United States v. Morgenstern,* 933 F.2d 1108 (2d Cir.1991), *cert. denied,* 502 U.S. 1101, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992), is unavailing. In *Blackmon,* this Court reversed the defendants' bank fraud convictions because the victim of the defendants' fraud was not the bank, but a woman whom the defendants had duped into withdrawing her money from the bank. The bank withdrawals in *Blackmon* were completely legal, 839 F.2d at 906–07, which is no small ground for distinguishing that case. Here, had the facts been as Wallace believed, the withdrawal of money from Citibank would have been illegal, since stolen checks were the source of the funds. And unlike *Blackmon,* there can be no question here that one of the intended victims of the conspiracy was Citibank, and that Citibank would have suffered actual harm had the facts been as Wallace believed.

*Morgenstern* can give Wallace no comfort, because the defendant's bank fraud conviction was upheld there on the ground that he had intentionally defrauded the bank and the bank had actually been victimized. *See* 933 F.2d at 1113–14 (distinguishing *Blackmon* ). Our case is the same.

\*　　\*　　\*　　\*　　\*　　\*

Having rejected all of Wallace's claims, we affirm the judgment of the district court.