**James M. STILLER and Nadine J. Stiller, Plaintiffs,**

v.

**SUMTER BANK AND TRUST CO., et al., Defendants.**

**Civ. No. 93–81–ALB/AMER(DF).**

United States District Court, M.D. Georgia, Albany/Americus Division.

Feb. 9, 1994.

Kevin R. Dean and William Sims Stone, Blakely, GA, for James M. and Nadine J. Stiller.

Ralph A. Pitts, Reginald R. Smith, C. David Vaughan, and Ellen G. Schlossberg, Atlanta, GA, for Sumter Bank & Trust Co. and Jerry Reeves.

Benjamin Franklin Easterlin, IV, Americus, GA, for C. Eugene Reeves and Wildflower Packing Co., Inc.

Richard Warren Fields, Albany, GA, for Robert H. Reeves.

## ORDER

FITZPATRICK, District Judge.

Defendants have moved individually to dismiss the federal and state civil Racketeering Influenced and Corrupt Organizations (RICO) Act counts from Plaintiff's complaint. Fed.R.Civ.P. 12(b)(6). Since jurisdiction in this court is based on the federal question presented by the RICO allegations, dismissal of that claim would authorize the court to dispose of the entire case. 28 U.S.C. § 1367.

In adjudicating a motion to dismiss, the court is constrained to only those facts asserted in Plaintiffs' complaint, which it must treat as true. A plaintiff's burden of production in response to a motion to dismiss is exceedingly low. *Quality Foods de Centro America, S.A. v. Latin America Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.1983). The purpose of motion to dismiss is not to challenge the factual allegations, but only to test the legal feasibility of the complaint. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that Plaintiffs can prove no set of facts in support of the claim that would entitle them to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 71, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Bracewell v. Nicholson Air Services, Inc.*, 680 F.2d 103, 104 (11th Cir.1982).

## BACKGROUND FACTS

Plaintiffs' factual allegations take more than 50 pages and 200 separately numbered paragraphs in the complaint to enumerate in detail. The court will summarize those allegations as fairly as possible.

In 1986, Plaintiffs' son was killed in an automobile accident. When they received the settlement in his wrongful death action in 1988, Defendant Eugene Reeves convinced Plaintiffs to move to Colquitt, Georgia.[1] Eugene then joined forces with his brother Jerry Reeves, who is an Executive Vice President at Defendant Sumter Bank and Trust, to convince Plaintiffs to deposit their settlement proceeds in Jerry's bank. Jerry reportedly told Plaintiffs on several occasions that the Sumter Bank would be the safest and best place to keep the money. The Plaintiffs deposited $300,000 of the settlement in three separate certificates of deposit ("CD's"). One of these CD's was jointly owned by the Stillers, the other two were individually owned.

With Eugene's help Plaintiffs located a farm they wished to purchase shortly after their move to Colquitt. The purchase price of this property was $129,000. The property consisted of just over 129 acres and included a house and other improvements.

Jerry recommended that Plaintiffs separate the property between the homestead and the working farm. The homestead would consist of the house and other improvements on about 29 acres. The loan for this portion would be secured by a deed to secure debt. The farm would consist of the other 100 or so acres. The loan for this portion of the price would be secured by the certificates of deposit held by the Sumter Bank. The Stillers agreed to this recommendation.

Again on Jerry's advice, Plaintiffs retained a third brother, Robert Reeves, to represent them in the closing of the loans for the farm and homestead. Neither Plaintiff reads very well. (In fact, Mr. Stiller has only a 6th grade education, something all of the Reeves were supposedly aware of.) At the closing, Robert asserted his opinion that all of the loan documents were correct and in order. In fact, the deed to secure debt for the purchase of the farm placed a lien on the entire farm property (no bifurcation as Plaintiffs had originally agreed). In addition, loan for the farm also encumbered the $300,000 in certificates of deposit held by the Bank. The Bank was obviously and significantly oversecured on this loan.

Shortly after the loan on the farm closed, Eugene again approached Plaintiffs, this time about purchasing a 25% interest in the produce packing business he had started called Wildflower, Inc. They discussed this decision with brother Jerry at the bank who endorsed the investment. They borrowed the money to purchase the interest in the packing company with the loan secured by their certificates of deposit. Plaintiffs then requested Robert Reeves, who was also Secretary/Treasurer of the packing company, to prepare stock certificates representing their share of the packing company. They have never received those certificates. In addition to their cash commitment to the investment, Plaintiffs were induced into signing a guaran-

---

1. Because three of the Defendants in this case are brothers, the court will identify them by their first names in this Order. By adopting this practice the court intends no disrespect nor slight to these Defendants.

ty of 25% of an original line of credit extended by Sumter Bank to Wildflower.

After Plaintiffs closed the deal for their investment in the packing company, Eugene began syphoning off funds from the corporation. Over the course of the next weeks and months, Eugene used money from the corporation to settle personal debts and for deposit to his personal account. Furthermore, Eugene induced Plaintiffs to enter into other business dealings with him and to extend their investment in the packing company.

Specifically, Eugene sought an additional $50,000 in "operating capital" from Mr. Stiller in the form of a loan to Wildflower. Eugene told Mr. Stiller that the loan to the company would be repaid the following year when the loan to the bank came due. Mr. Stiller opened a credit line of $50,000 with the bank secured by his personally owned certificate of deposit. On at least one occasion, Eugene had his brother Jerry draw money from this credit line belonging to Mr. Stiller and deposit the proceeds in the packing company account. Of this money, Eugene then took at least $5,000 and deposited it to his own account in the Sumter Bank.

Then again in September and October 1990, Eugene told Mr. Stiller that the packing company needed an additional "operating capital" infusion. He induced Mr. Stiller to take another $50,000 line of credit secured by the balance of his individually owned certificate of deposit. Of this line of credit, $10,000 was paid as a capital contribution to a partnership that had been formed between Mr. Stiller and Eugene. The balance was loaned to the packing company. Neither of these loans from Mr. Stiller to the packing company were repaid by the company; therefore, Mr. Stiller had no funds with which to repay Sumter Bank when the notes came due.

On several occasions during the Stillers' association with Eugene he diverted funds from checks made payable to Wildflower, Inc. to his private use. Plaintiffs allege that these diversions were done with the knowledge, cooperation and assistance of Sumter Bank and Jerry Reeves.

Over the next several months, the business operation at the packing plant continued to deteriorate. The corporation borrowed additional money from the bank without notice to Plaintiffs. As more and more notes came due for larger and larger amounts, it became apparent that there simply was not enough money to pay all of the debts.

The end result of this course of conduct is that Sumter Bank began foreclosure proceedings on the farm and the certificates of deposit. After just over 2 years, Plaintiffs had been defrauded out of their entire settlement from the death of their son and faced possible deficiency action for any additional balance due.

## *DISCUSSION* [2]

■ To sustain an action for relief under the civil RICO statute, Plaintiff must prove several elements. 18 U.S.C. § 1961, 1962.[3] First, Plaintiffs must prove the existence of an enterprise. Second, that the enterprise affected interstate commerce. Third, that the defendants were associated with the enterprise. Fourth, that the defendants participated, directly or indirectly, in the conduct of the enterprise. And fifth, Plaintiffs must show that defendants participated through a pattern of racketeering activity. *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir.1982) *cert. denied* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300

---

2. Defendant Robert Reeves asserts alone that he only performed routine legal work for Plaintiffs and that there is no allegation that he personally participated in the scheme to defraud them. On the contrary, Robert was an officer in Wildflower, Inc. and is alleged to have participated in the diversion of funds from the corporation as well as misrepresenting the contents of the loan documents regarding the farm purchase. His argument, at this stage of the proceedings, is meritless.

3. The substantive analysis to determine whether a complaint states a claim for federal and state RICO is essentially the same. *See Bell v. Trust Co. Bank*, Civ. No. 87–175–ALB/AMER (M.D.Ga. Sept. 24, 1991); *J.G. Williams, Inc. v. Regency Properties, Ltd.*, 672 F.Supp. 1436 (N.D.Ga.1987); *Mills v. Fitzgerald*, 668 F.Supp. 1554 (N.D.Ga. 1987). The Georgia statute may not contain the continuity aspect of the federal statute, *see Moore v. Barge*, 436 S.E.2d 746, 751 (Ga.App.1993), but that difference is of no importance for purposes of this Order.

(1983). The pattern of racketeering activity requires proof of two related predicate criminal acts. These are crimes listed in the statute that Congress has determined pose a threat to the economic integrity of the country. In this case, Plaintiffs have alleged mail fraud and bank fraud. Second, Plaintiffs must show that the actions were part of an ongoing criminal enterprise. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241–250, 109 S.Ct. 2893, 2901–06, 106 L.Ed.2d 195 (1989).

Defendants attack Plaintiffs' complaint on the final element of proof only. Arguing that the RICO statute was not intended to encompass what they call "garden variety fraud," Defendants first assert that there are not two predicate criminal acts by the Defendants. They assert there is no violation of the bank fraud statute because Sumter Bank was not an intended victim of whatever scheme to defraud may have been present. They further contend that there was no violation of the mail fraud statute.[4] Second, assuming the court finds that the predicate acts alleged are sufficient, they assert that Plaintiff cannot prove a continuing criminal enterprise because there was only one scheme, with one victim, and one target. If the federal cause of action fails at this stage, the proper course would be to dismiss the remaining counts without prejudice and permit Plaintiffs to refile their action in a proper Georgia Court.

## I. Bank Fraud

■ Defendants' first argument is that there has been no violation of the bank fraud statute because the bank was not an actual or intended victim of the scheme. *United States v. Stavroulakis*, 952 F.2d 686 (2nd Cir.) *cert. denied* —— U.S. ——, 112 S.Ct.

1982, 118 L.Ed.2d 580 (1992). Defendants also rely upon *United States v. Blackmon*, 839 F.2d 900 (2d Cir.1988). The facts of both cases make their conclusions inapplicable to this case. In each case cited by Defendants, the individual victims withdrew funds themselves from their own account to pay over to the fraudulent scheme. The court held that under those circumstances there was no risk of loss to the bank because the accountholder/victim lawfully withdrew funds from his own account. There were no misrepresentations directed at, or made to, the bank itself.

■ The bank fraud statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, **or under the custody or control of,** a financial institution, by means of false or fraudulent pretenses, representations or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (Supp.1993) (emphasis added). As Plaintiffs correctly point out, the phrase "under the custody or control of" must refer to property or money of the bank's customers. As long as the bank is exposed to the **risk of loss** by some scheme or artifice, the statute has been violated. *United States v. Briggs*, 965 F.2d 10, 12 (5th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1016, 122 L.Ed.2d 163 (1993); *United States v. Lemons*, 941 F.2d 309 (5th Cir. 1991); *United States v. Morgenstern*, 933 F.2d 1108 (2d Cir.1991) *cert. denied,* —— U.S. ——, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992).[5]

---

**4.** If either predicate act fails, the RICO allegation fails because two criminal acts are necessary to prosecute (civilly or criminally) a federal RICO action.

**5.** In *Morgenstern* the defendant induced his clients to provide him checks for nonexistent tax liabilities. He would then deposit those checks in an account that he controlled personally. The defendant had argued that the statute did not apply because he did not intend to deceive or defraud the bank. The Second Circuit disagreed,

saying, "[T]his conduct induced the bank to allow the deposit of funds (into the [defendant's personal] account) and their subsequent withdrawal that, in the absence of fraud, it would never have permitted." 933 F.2d at 1114. The court when on, "One of Congress' expressed purposes in enacting the bank fraud statute in 1984 was to extend coverage to offenses involving the taking of property from banks by false pretenses in which there is not a taking and carrying away of property." *Id.*

In the present case, Plaintiffs have alleged and could possibly prove that the Sumter Bank was exposed to a potential civil liability or other loss. It is clear that the packing house operation was seriously overextended and did not have sufficient collateral to cover its defaulted loans. Even with the security provided by Plaintiffs' certificates of deposit, it appears that the bank was undersecured for its loans. This alone creates a risk of loss to the bank.

In addition, the complaint alleges at least three separate instances where Eugene Reeves could be shown to have misrepresented his authority to Sumter Bank. He is said to have diverted to his personal account funds from checks written to the packing house. Eugene allegedly withdrew the balance of a line of credit opened by Mr. Stiller in his own name without the apparent authority to do so. Finally, Eugene's alleged embezzlement of funds from the corporation to his own account creates the possibility that the Bank could be liable to the corporation for permitting these unauthorized withdrawals. (This last possibility for liability exists because of the fiduciary relationship alleged by Plaintiffs to exist between themselves and Jerry Reeves.)

■ The Bank was at risk of loss. " 'By falling prey to this scheme the bank lost custody over its accountholder's money, exposing the bank to the real threat of civil liability for having succumbed to [defendant's] fraudulent conduct.' " *Briggs*, 965 F.2d at 13 (*quoting Morgenstern*, 933 F.2d at 1114). Each one of the actions by Eugene Reeves listed above puts the Bank at a risk of potential loss and is part of the greater scheme to defraud Plaintiffs. It is not necessary to prove every one of the overt acts alleged in a conspiracy to prove the conspiracy. *United States v. Horton*, 646 F.2d 181, 186 (5th Cir.) *cert. denied* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981). A reasonable jury could conclude that any one of these individual actions occurred and thus find a violation of the bank fraud statute.

■ The Bank contends in its reply brief that it is illogical to hold it liable under the Bank Fraud statute for a scheme to defraud itself. However, the Bank's liability is predicated on the actions alleged to have been committed by its officer—Executive Vice President Jerry Reeves. *Respondeat superior* liability is a proper basis for recovery in a RICO action. *Quick v. Peoples Bank of Cullman County*, 993 F.2d 793, 795–96 (11th Cir.1993).

Defendants argue that *Quick* does not apply in this action because there is no mention of the bank fraud statute in the opinion. However, even a casual reading of the text shows that the bank fraud statute had to have been pled as part of the complaint. In *Quick*, the plaintiffs were defrauded by a vice president of the defendant bank, a Mr. Buckelew. Buckelew began to demand participation in plaintiffs' business after arranging a loan for them through his bank while he acted as a loan officer. He also intercepted deposits and loan payments payable to his employer during the regular business hours of the bank. Under those facts and where the bank then acquiesced in the conduct by requiring a consolidation loan to cover arrearages resulting from the intercepted payments, the Eleventh Circuit held that the bank could properly be held liable.[6]

The court concludes that the complaint sufficiently pleads a cause of action for bank fraud. Many indictments brought by the United States allege bank fraud with less particularity than is found in this complaint. Taking the allegations as true, the complaint states a violation of the Bank Fraud statute.

## II. Mail Fraud

■ Defendants next contend that there is no showing in this case that they committed an act of mail fraud. They argue that the ordinary business mailings of monthly statements, foreclosure letters or the like cannot, as a matter of law, amount to fraudu-

---

**6.** There are three elements required: (1) conduct in the scope of the agent's employment; (2) in furtherance of the employer's business; (3) acquiesced or authorized by the employer. *Quick*, 993 F.2d at 797–98. Taking the complaint as true, as this court is required to do, there would be more than sufficient evidence in this case to satisfy these elements of proof and hold the bank liable.

lent use of the mails. They also contend that Plaintiffs have insufficiently plead mail fraud because they have not identified the fraudulent content of the mailings at issue.

Defendants correctly argue that the use of the mails must be an integral, rather than incidental, part of the fraudulent scheme. However, " '[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.' " *United States v. Smith,* 934 F.2d 270, 274 (11th Cir.1991) (*quoting Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)). In this case, Plaintiffs allege that Eugene Reeves, Robert Reeves,[7] and Wildflower used the mails to send bills to customers. Once payment was received (also through the mail) on those bills, Eugene would allegedly divert some of those payments to his personal use. Clearly, the use of the mails followed in the course of the fraudulent business in this case.

Similarly, the use of the mails was necessary to the success of the scheme from Jerry Reeves' perspective. As Plaintiffs allege, all of the business between the Reeves, the Bank, and Plaintiffs must appear ordinary and matter-of-fact. To accomplish this goal, regular mailings of statements and other correspondence could be found to be instrumental in completing the object of the scheme to defraud the Stillers.

In addition, the bank used the mails to avail itself of the advantage created by its officer. The bank sent letters demanding payment in full of the outstanding loan balances or threatening legal action. As discussed above, one of the elements for holding the bank liable under a *respondeat superior* theory is that the bank ultimately benefitted from the fraudulent conduct of its agent. The letters described in the complaint satisfy that element. Since those letters form part of the basis of the scheme to commit bank fraud, the use of the mails as part of that fraud brings the conduct within the mail fraud statute as well.

Defendants rely on *Robert Suris General Contractor Corp. v. New Metropolitan Federal Savings & Loan Ass'n,* 873 F.2d 1401 (11th Cir.1989) for the proposition that putting notices or statements in the mail in the ordinary course of legitimate business activity does not constitute a violation of the mail fraud statute. 873 F.2d at 1406. In that case, the district court had granted a motion for summary judgment and the only mailings alleged in the complaint were the bank statements sent each month in the ordinary course of the bank's regular business. In affirming the district court's grant of summary judgment, the circuit court noted that the mail fraud statute has been violated even if the mailing is only incidental to some other essential part of the scheme. 873 F.2d at 1406 (*quoting Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989)). However, the circuit court agreed that there was nothing fraudulent about this course of conduct. In contrast, as noted earlier, a jury could conclude from the facts of this case that the mailing of the bills to Wildflower customers, the correspondence from the bank to the Stillers regarding foreclosure, or any number of other use of the mails were part and parcel to the overall scheme to defraud.

The court concludes that the complaint has plead a violation of the mail fraud statute.

## III. Continuity of the Criminal Enterprise

Defendants final joint argument is that Plaintiffs cannot prove sufficient continuity of the enterprise to satisfy the RICO statute. They contend that RICO liability must be based on a large organization with many criminal objects and many victims. *Helman v. Murry's Steaks, Inc.,* 742 F.Supp. 860, 881 (D.Del.1990). This may be shown, they argue, by a "closed-ended" pattern of repeated activity, or by "opened-ended" conduct that by its breadth and length threatens future illegal activity. *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195

7. Recall that Robert Reeves was Secretary/Treasurer of Wildflower, Inc. As an officer of the corporation he owed a duty of loyalty to the shareholders.

842

(1989); but in either case there must be more than one victim of the supposed criminal conduct. Defendants conclude that neither type of pattern of racketeering is present in this case.

The Eleventh Circuit has examined the requirements in *Northwestern Bell* on at least three occasions. In each instance, the court has concluded that the conduct alleged satisfied the pattern of activity requirement with no mention of the number of victims, the type of injury, or the number or perpetrators.

▮ In *United States v. Kotvas*, 941 F.2d 1141 (11th Cir.1991), *cert. denied* — U.S. ——, 113 S.Ct. 982, 122 L.Ed.2d 135 (1993), the court approved a jury charge setting out the requirement of continuity of criminal activity. The jury had convicted the three defendants who were indicted for a pattern of bribery and fraud to influence the conduct of the Hillsborough County Commission in Tampa, Florida. Thus, it is apparent as an initial matter that the continuing nature of the criminal activity is generally a jury issue.

Similarly in *United States v. Hobson*, 893 F.2d 1267 (11th Cir.), *cert. denied* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990), the court, in considering a remand from the Supreme Court, held that a single instance of importing marijuana into the United States is sufficient to constitute a pattern of criminal activity. In *Hobson*, the defendant had prepaid for a load of marijuana to be delivered to a clandestine landing strip in Florida. When weather conditions and mechanical problems caused the planned landing to be aborted, the plane landed at an airfield where federal agents waited. Hobson then pressured the seller to produce an identical load of marijuana or return the advance payment. The court held that there were several acts of criminal activity proven at trial, not just the single action of a prepayment for the importation of marijuana. 893 F.2d at 1269. The court concluded that the demand for a replacement shipment or a return of the advance payment, by their very nature, threatened repetition of the illegal conduct. A single defendant was thus convicted for a single shipment of marijuana. The number

of perpetrators or schemes seems unimportant in this circuit.

Finally, in *United States v. Alexander*, 888 F.2d 777 (11th Cir.1989) *cert. denied* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 643 (1990), the court upheld defendant's conviction on a RICO charge because of the commonality of purpose, method and result. While the scheme in which he was involved lasted several years, the period of time alone was not determinative in the court's decision to uphold Alexander's conviction. 888 F.2d at 778.

The Eleventh Circuit has repeatedly alluded to the breadth with which RICO is to be read. *Kotvas*, 941 F.2d at 1146; *United States v. Starnes*, 644 F.2d 673, 678 (7th Cir.1981). In addition, the continuity of the criminal enterprise is generally a jury question. *Kotvas*, 941 F.2d at 1144–45. Based on the authority discussed above, the court concludes that final disposition of this case at this stage of the proceedings is inappropriate because a jury could conclude, on proper instruction, that "the predicate acts are part of an organizational entity's regular way of doing business," *Hobson*, 893 F.2d at 1269 (*citing Northwestern Bell*, 492 U.S. at 243, 109 S.Ct. at 2902), and thus constitutes a pattern of criminal activity.

### CONCLUSION

The various motions of the Defendants to dismiss the federal RICO claims of Plaintiffs are DENIED. Since this court has not dismissed the federal claim, the court retains supplemental jurisdiction over the state law claims.

The parties shall submit a proposed scheduling and discovery order (which is overdue) to this court within 30 days of the date of this Order. The contents of the proposed order shall comply with Federal Rule of Civil Procedure 16 as amended, effective December 1, 1993, as well as the court's Memorandum to Counsel dated November 22, 1993.

SO ORDERED.