JILL PRYOR, Circuit Judge,
concurring in the judgment:
I agree with my colleagues that Doran’s conviction cannot stand. I reach that conclusion by a different route, however. In a prosecution under 18 U.S.C. § 666, the government must, in addition to proving the criminal conduct (embezzling, stealing, obtaining by fraud, or converting property), identify the relevant organization to which the statute refers and prove that it received over $10,000 in qualifying federal benefits “in any one year period.”[1] 18 U.S.C. § 666(b). As I read § 666, the relevant organization here is Florida State University (“FSU”), the organization that employed Doran, not the Student Investment Fund (the “SIF”), the student organization he advised that was the victim of his embezzlement. As such, the government needed to prove beyond a reasonable doubt that FSU — not the SIF — received over $10,000 in qualifying federal benefits during the relevant period. The government failed, however, to introduce evidence on this point sufficient to support a jury verdict. Accordingly, I agree with the majority that we must vacate Doran’s conviction.
I. The Meaning of 18 U.S.C. § 666
Doran argues, and the majority agrees, that the government needed to prove that *1317 the SIF, as the victim organization, received over $10,000 in qualifying federal benefits during the relevant period. In my view, however, 18 U.S.C. § 666 imposes no such requirement. Instead, it requires that FSU, the organization Doran served as an agent (as opposed to the SIF), received such benefits.
My analysis of § 666’s meaning begins with its text. See Bodine v. Cook’s Pest Control Inc., 830 F.3d 1320, 1329 (11th Cir. 2016) (“ ‘Our inquiry begins with the statutory text, and ends there as well if the text is unambiguous’ ” (alteration omitted) (quoting BedRoc Ltd. v. United States, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (plurality opinion))). The statute provides, in relevant part:
(a) Whoever, if the circumstance described in subsection (b) of this section exists—
(1) being an agent of an organization
[[Image here]]
(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
(i) is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization ...
shall be fined under this title, imprisoned not more than 10 years, or both.
(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
18 U.S.C. § 666(a), (b). The statute defines an “agent” as “a person authorized to act on behalf of another person or a government and, in the case of an organization ... includes a[n] ... employee.” Id. § 666(d)(1).
Under § 666’s plain language, to secure Doran’s conviction the government needed to prove beyond a reasonable doubt that he was “an agent of an organization” and' that he (in this case) “embezzlefd] ... property that ... [wa]s under the care, custody, or control of such organization,” id. § 666(a)(l)(A)(ii) (emphasis added); that is, the organization of which Doran was an agent. Section 666 further required the government to prove that “the organization ... receive[d] ... benefits in excess of $10,000 under a Federal program.” Id. § 666(b) (emphasis added). Although the property that Doran was charged with embezzling was required to be “under the care, custody, or control of’ the organization that employed him, id. nothing in the statute required the government to prove that the victim of Doran’s embezzlement received any federal benefits at all. Because the text of § 666 is unambiguous, we need not go further to interpret the statute.
In the paradigmatic prosecution under § 666, in which a defendant is charged with embezzling, stealing, obtaining by fraud, or converting his employer’s[2] property, the conceptual distinction between *1318 the defendant’s victim and the organization he serves as an agent would be of no moment. Suppose, for example, that a doctor embezzles money from her employer, a hospital that receives federal benefits. In this example, the hospital is both the doctor’s employer and her victim. And so it likely is in most prosecutions under § 666.
But what if a defendant who works for Organization A steals funds owned by another organization, Organization B? By permitting the government to charge a violation where the ill-gotten property either “is owned by, or is under the care, custody, or control” of the defendant’s employer, § 666 contemplates that the employer may not always be the property’s ultimate owner. Id. § 666(a)(l)(A)(ii) (emphasis added). In this admittedly unusual scenario, to secure a conviction the government would need to prove that Organization A, not Organization B, received the requisite amount of federal benefits. That is because “the organization” that § 666 requires to have “receive[d] ... benefits in excess of $10,000 under a Federal program” is the organization that the defendant served as “an agent.” Id. § 666(a)(1), (b).
This is not to say that the defendant’s victim may lack any connection to the federal benefits whatsoever — the government must still prove that the ill-gotten property of the victim was in the employer organization’s “care, custody, or control.” Id. § 666(a)(l)(A)(ii). Although this Court has not previously construed § 666’s “care, custody, or control” element, the term plainly requires that the employer organization had responsibility for or control over the embezzled property, though not that it owned the property itself.[3] Thus, although § 666 does not require the victim itself to have received federal benefits, it does require at a minimum that the victim’s property be in the “care, custody, or control” of an organization that received over $10,000 in such benefits during the relevant period in order for the defendant’s conduct to constitute a federal offense. Id. This requirement limits § 666’s application “to conduct bearing a sufficient connection to the expenditure of federal funds or the integrity of federal programs.” United States v. Edgar, 304 F.3d 1320, 1325 (11th Cir. 2002).
Once it has identified the organization that the defendant served as an agent, what must the government show to prove that the organization “receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance”? 18 U.S.C. § 666(b). In Edgar, we construed this provision to require proof that the federal programs that disbursed funds to the predicate organization are “defined by a sufficiently comprehensive ‘structure, operation, and purpose’ to merit characterization of the funds as benefits under § 666(b).” 304 F.3d at 1327 (quoting Fischer v. United States, 529 U.S. 667, 681, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000)). “The inquiry should examine the conditions under which the organization receives the federal payments.” Fischer, 529 *1319 U.S. at 681, 120 S.Ct. 1780. We elaborated on this construction of § 666(b) in United States v. McLean, holding that to sustain' a § 666 conviction, the government must “show a relationship between the structure, operation, and purpose of the federal scheme authorizing the distribution of funds and their ultimate use at the relevant local level.” 802 F.Sd 1228, 1244 (11th Cir. 2015) (internal quotation marks omitted).
To summarize, § 666 requires the government to prove, in addition to the defendant’s underlying criminal conduct, that (1) the defendant served as an agent of an organization (2) that had “care, custody, or control” of the property that the defendant misappropriated, 18 U.S.C. § 666(a)(l)(A)(ii), and (3) that received, during a one year period, over $10,000 in federal funds that were disbursed through programs whose “structure, operation, and purpose” are sufficiently cohesive to warrant the funds’ characterization as “benefits.” Edgar, 304 F.3d at 1327 (internal quotation marks omitted).
II. Doran’s Challenge to the Sufficiency of the Evidence
Although the majority arrives at the correct outcome in this case, I would reach it differently. Applying § 666, as I read it, to the facts of this case, I would reverse Doran’s conviction on the sole ground that the evidence at trial was insufficient to prove to a reasonable jury beyond a reasonable doubt that FSU received the requisite amount of federal benefits during the relevant period under 18 U.S.C. § 666(b). See United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004). The government’s evidence on this issue simply does not satisfy Edgar's robust standard.
A. Element (1): Proof that Doran was an Agent of FSU
To secure Doran’s conviction under § 666, the government needed to identify the relevant organization that Doran served as an agent. Here, that organization is FSU — Doran was indicted and convicted as an “an agent of Florida State University” (Docs. 1 at 1; 49; 50).[4] It is undisputed that Doran was “an agent of’ FSU at the time he embezzled the SIF’s funds. 18 U.S.C. § 666(a)(1).
Citing McLean, Doran argues that the SIF, not FSU, is the relevant organization for purposes of our § 666 analysis, because the funds he embezzled from the SIF neither belonged to nor flowed from FSU. In my view, McLean does not support his argument.
McLean served simultaneously as a Commissioner for the City of Margate, Florida and on the board of the Margate Community Redevelopment Agency (“MCRA”), a municipal economic development agency. Id. at 1232. In the latter capacity, McLean solicited bribes from a local businessman with the promise of steering MCRA funds the businessman’s way through a fraudulent construction grant application. Id. at 1232-33. The FBI uncovered the scheme, and McLean was indicted on two counts of bribery in programs receiving federal funds as “an agent of [the City of] Margate,” in violation of § 666. Id. at 1231-32. The district court’s jury instructions explained, however, that to convict McLean on those counts, the jury would need to find “that during the one-year period ... the [MCRA] received *1320 benefits in excess of $10,000 under a federal program involving some form of federal assistance.” Id. at 1245. The jury convicted McLean on both counts, id. at 1240, 1243, and by the time the case reached our Court, the government had conceded that the MCRA, not the City of Margate, was “the relevant local level” for our analysis of the federal benefits element. See id. at 1234, 1244 (“The government asserts that, viewing the evidence in the light most favorable to the government, the United States sufficiently established that the MCRA received federal benefits in excess of $10,000.”). In doing so, the government effectively conceded that the MCRA was the relevant organization.
In reviewing McLean’s convictions on appeal, we decided the only question the parties put to us, which was whether the evidence at trial sufficed to prove that the MCRA had received over $10,000 in funds from “programs defined by a sufficiently comprehensive structure, operation, and purpose to merit [their] characterization ... as benefits.” Id. at 1231 (internal quotation marks omitted). In looking at the sufficiency of the evidence, we followed the parties in identifying the MCRA, rather than the City of Margate, as “the relevant local level” for conducting our § 666 analysis. Id. at 1244. But we never considered which organization — the MCRA or the City of Margate — was in fact the relevant organization for the purposes of our analysis, as the parties did not brief or argue that issue on appeal. See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 170, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) (“Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.” (internal quotation marks omitted)).
As such, I do not read McLean as requiring the government to prove that the SIF is the relevant organization for our § 666 analysis. To convict Doran, the government needed to prove that Doran was an agent of FSU and that FSU had “care, custody, or control” over the embezzled funds and received over $10,000 in federal benefits during the relevant period. 18 U.S.C. § 666(a)(l)(A)(ii), (b). Doran does not challenge the sufficiency of the government’s proof of the first element. We discuss the other two elements below.
B. Element (2): Proof that FSU Had Care, Custody, or Control Over the Funds that Doran Embezzled
Having correctly identified FSU as the relevant organization under § 666, the government was required to prove that FSU exercised “care, custody, or control” over the funds that Doran embezzled.[5] Id. § 666(a)(l)(A)(ii). As I explained above, § 666 did not require the government to prove that FSU owned the embezzled funds. By its plain terms, the statute allowed the government to prove that FSU either “owned ... or ... [had] care, custody, or control of” the funds that Doran embezzled. 18 U.S.C. § 666(a)(l)(A)(ii) (emphasis added). The fact that it was the SIF’s money Doran embezzled thus does not change this analysis.
The government proved that (1) FSU determined the composition of the SIF’s Board of Directors, see SIF Articles of *1321 Incorporation (“SIF Articles”) art. VII, §§ 1, 2; (2) FSU officers or employees held six of seven Board positions, see id; (3) FSU’s Board of Trustees and president each had veto power over changes to the SIF’s Articles and bylaws, see id art. IX; (4) Doran, an FSU employee, managed the SIF’s funds on a day-to-day basis, executing trades, vetoing investment decisions he thought unwise, and moving funds in and out of the SIF’s bank account; and (5) the SIF was a “University direct-support organization” under Florida law, see Fla. Stat. § 1004.28;[6] SIF Articles art. IV, § 1. This evidence sufficed to enable a “reasonable trier of fact, choosing among reasonable interpretations of the evidence, [to] find ... beyond a reasonable doubt” that FSU had care, custody, or control over the funds that Doran embezzled.[7] Pineiro, 389 F.3d at 1367.
C. Element (3): Proof that FSU Received the Requisite Federal Benefits
The government failed to meet its burden to prove that FSU received the requisite amount of federal benefits during the relevant period. Viewing the evidence in the light most favorable to the government, I conclude that no reasonable jury *1322 could have found beyond a reasonable doubt that FSU received over $10,000 in federal funds “in connection with programs defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of the funds as benefits under § 666(b).” McLean, 802 F.3d at 1231 (quotation marks omitted).
With respect to the federal benefits element of § 666, it was the government’s burden to “prove beyond a reasonable doubt that [Doran] worked for an entity which received (1) more than $10,000 in federal funds (2) in connection with programs defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of the funds as benefits under § 666(b).” McLean, 802 F.3d at 1237 (alterations and internal quotation marks omitted). To satisfy this test, the government must at a minimum identify (1) one or more particular disbursements of federal funds to the recipient organization during the relevant one year period; (2) the dollar amount of each disbursement, the sum of which must exceed $10,000; (3) the date each disbursement was made; and (4) a sufficiently particularized purpose for which each disbursement was made. McLean, 802 F.3d at 1237. We “scrutinize the actual evidence” the government presented as to whether federal funds rise to the level of “benefit.” Id. at 1231, 1240. “To satisfy this scrutiny, a court should examine the conditions under which the organization receives the federal payments.” Id. at 1236 (internal quotation marks omitted).
The government’s sole evidence as to the “structure, operation, and purpose,” id. at 1237, of the federal programs that provided funding to FSU was the testimony of Pamela R. Ray, FSU’s Director of Sponsored Research. Ray described the federal programs that disbursed funds to FSU in broad and general terms that failed to provide the sort of detail that McLean requires. She identified several disbursements of funds to FSU during the period in which Doran’s conduct transpired and gave precise dollar amounts for some disbursements, dates of disbursement for others, and particularized purposes for others still, but for no disbursement did she identify all three.
For example, Ray testified that FSU received $179 million in federal funds during Fiscal Year 2010 and $165 million in federal funds during Fiscal Year 2011,[8] but she gave no dates and described no program or purpose for which the funds were disbursed. She testified that FSU’s National High Magnetic Field Lab at Innovation Park, its Learning System Institute, its Center for Disease Prevention at the College of Medicine, its Center for Advanced Power Systems, and unspecified departments in FSU’s arts and sciences colleges received federal funding, but again provided no dates on which the funds were disbursed or dollar amounts that were received. She described the purposes for this funding at a high level of generality:
The federal government has utilized universities for many years to tap into the wealth of knowledge that a university has all the way from humanities through the hard sciences; and they benefit in that they are able to target specific experience that professors and faculty and staff at universities have. And in most cases they get better value if they go to universities for this information to ad- *1323 vanee science or new discoveries, or whatever the federal government is interested in....
[Y]ou look at the federal programs that Florida State receives, the National Institute of Health, you know, they are designed — and this is technical, so it’s something that I’m not really exactly experienced in, but — the technical side of the National Institute of Health is for disease control, for new drugs. And then, for instance, the National Science Foundation, we get a lot of money from them to advance more of the psychology, the biological sciences, where they are looking at the new discoveries and new technologies to, in other words, help the common good for the public.
(Doc. 52 at 8.) Ray also testified that FSU’s College of Business received $40,000 from an unspecified federal agency on an unspecified date or dates in Fiscal Year 2011, but she identified no program or purpose for which the funds were disbursed. For no program did she provide any information about its structure or operation or any conditions under which the funds were received.
Such generalized descriptions cannot suffice to demonstrate the existence of a federal program “defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of [its] funding] as benefits.” McLean, 802 F.3d at 1237 (internal quotation marks omitted). The government failed to elicit testimony from Ray or present any other evidence sufficient to establish that FSU received “benefits” within McLean’s meaning. Id. at 1240. For this reason — and only this reason — I would reverse Doran’s conviction under § 666.
III. The Constitutionality of § 666
Doran argues that construing § 666 to require the government to prove that FSU, rather than the SIF, received the requisite amount of federal benefits would render the statute unconstitutional. “[I]t is a well-established principle governing the prudent exercise of [our] jurisdiction that normally th[is] Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.” Bond v. United States, — U.S. —, 134 S.Ct. 2077, 2087, 189 L.Ed.2d 1 (2014) (internal quotation marks omitted). Because the majority and I would reverse Doran’s convictions on the ground that the government’s evidence was insufficient for a reasonable jury to find each element of § 666 beyond a reasonable doubt, we need not and should not reach his constitutional challenge to the statute.
The majority opinion states, however, that § 666’s “net cannot be cast so widely as to encompass the wrongdoing that occurred here, for the Government has not demonstrated any federal interest.” Maj. Op. at 1316. Reading this statement to mean only that § 666 does not reach Do-ran’s conduct as a matter of statutory interpretation, I take no issue with it, even though I disagree with the majority’s construction. Nevertheless, to the extent the statement could be read to suggest that Congress’s Article I power cannot constitutionally reach Doran’s conduct, I pause to make some brief observations. First, I suggest the better course would be to refrain from addressing this question until it is necessary to the resolution of a case before us.
Second, were we to evaluate the constitutionality of the statute, we would apply the following standard: “[I]n determining whether” Congress has “the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.” United States v. Comstock, 560 U.S. 126, 134, 130 S.Ct. *1324 1949, 176 L.Ed.2d 878 (2010). Congress’s authority to enact § 666 flows from the Spending Clause. See Article I, § 8, cl. 1; Sabri v. United States, 541 U.S. 600, 605, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004). The majority does not address the argument that § 666, applied to Doran’s prosecution, is a valid exercise of Congress’s authority under the Spending Clause to ensure that taxpayer dollars are not used to line thieves’ pockets. Moreover, as the district court- observed, “[n]o prudent benefactor would knowingly provide funds to an organization that employs a thief— regardless of whose funds the thief makes a practice of stealing.” (Doc. 85 at 21.) The majority also does not address the fact that FSU financially supported the SIF in the form of classroom space, a faculty ad-visor whose salary it paid,[9] and other non-monetary resources.
We should not raise doubts about § 666’s constitutionality without considering these points. I do not mean to suggest that all or any of them are meritorious. To the contrary, I believe we should refrain from addressing — however off-handedly— the extent of Congress’s authority to criminalize conduct such as Doran’s. We have no duty to ask whether § 666 — read more broadly than the majority construes it— would survive constitutional scrutiny because this case does not turn on the statute’s constitutionality.
IV. Conclusion
For the reasons explained above, I concur in the majority’s judgment that Do-ran’s conviction must be reversed.

. The statute defines this term to mean “a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense.” 18 U.S.C. § 666(d)(5). "Such period may include time both before and after the commission of the offense.” Id.

. I use employment terminology here as a shorthand for the various agency relationships § 666 reaches. See 18 U.S.C. § 666(d)(1) (“[TJhe term 'agent' means a person authorized to act on behalf of another person or a government and, in the case of an *1318 organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.”).

. See, e.g., Model Crim. Jury Instr. for the 3d Cir. No. 6.18.666A1A-4 ("[T]he words 'care,' 'custody,’ and 'control' ... express a similar idea. That is that the organization ... had control over and responsibility for the property even though it was not the actual owner of the property at the time of [the defendant]'s actions.” (alterations omitted)).

. All references to "(Doc._)” refer to the numbered district court docket entries.

. Doran urges us to adopt the definition of "care, custody, or control” used in the Third Circuit's Model Criminal Jury Instructions. See supra note 3. I accept that definition, which does not change the result here.

. A “University direct-support organization” is an organization that is
1. A Florida corporation not for profit incorporated under the provisions of chapter 617 and approved by the Department of State.
2. Organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida or for the benefit of a research and development park or research and development authority affiliated with a state university and organized under part V of chapter 159.
3. An organization that a state university board of trustees, after review, has certified to be operating in a manner consistent with the goals of the university and in the best interest of the state. Any organization that is denied certification by the board of trustees shall not use the name of the university that it serves.
Fla. Stat. § 1004.28(l)(a). “The chair of the university board of trustees may appoint a representative to the board of directors and the executive committee of any direct-support organization.” Id. § 1004.28(3). In addition, “[t]he president of the university!)] ... or his or her designee, shall also serve on the board of directors and the executive committee of any direct-support organization established to benefit that university.” Id. Direct-support organizations must submit to annual audits by independent certified public accountants in accordance with rules adopted by the university board of trustees. Id. § 1004.28(5)(a). Audit reports must be submitted to the Board of Governors of the State University System of Florida for review. Id. "The Board of Governors [and] the university board of trustees ... shall have the authority to require and receive from the organization or from its independent auditor any records relative to the operation of the organization.” Id.

. Citing Stiller v. Sumter Bank and Trust Co., 860 F.Supp. 835 (M.D. Ga. 1994), Doran argues that to prove § 666’s "care, custody, or control” element, 18 U.S.C. § 666(a)(l)(A)(ii), the government needed to prove that his embezzlement exposed FSU to a risk of loss. Stiller involved a civil claim under the federal bank fraud statute, which prohibits the use of false or fraudulent means to obtain “property ... under the custody or control of[ ] a financial institution,” 18 U.S.C. § 1344(2); “[a]s long as [a] bank is exposed to the risk of loss by some scheme or artifice,” Stiller said, “[§ 1344] has been violated.” Stiller, 860 F.Supp. at 839. Stiller did not construe § 1344 to require proof that an organization bore the risk of loss for a defendant's conduct to establish the organization’s custody or control over the misappropriated property; it held only that such proof suffices to satisfy the statute. For similar reasons, I do not read § 666 to require proof that FSU bore the risk of loss for Doran's embezzlement of the SIF's funds.

. Ray testified that the term "Fiscal Year X” refers to the period beginning on July 1 of the year prior to Year X and ending on June 30 of YearX.

. The SIF did not pay Doran a salary; its bylaws provided that its officers "shall receive no special salary or compensation for being officers of this Corporation other than their usual salaries as employees of The Florida State University, if so employed.” SIF Bylaws art. Ill, § 8.